# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENNY TAPIA, | CASE NO. 1:03-CV-5422-AWI-SMS-P |
| Plaintiff, | ORDER GRANTING MOTION FOR REVIEW OF ADDITIONAL EXHIBITS |
| v. | (Doc. 70) |
| EDWARD ALAMEIDA, et al., | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| Defendants. | |
| | (Docs. 59-61) |
| | ORDER DISMISSING PLAINTIFF'S VOID FOR VAGUENESS AND OVERBREADTH CLAIMS, WITH LEAVE TO AMEND |

I.      Order Resolving Defendants' Motion for Summary Judgment

A.      Procedural History

Plaintiff Benny Tapia ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983 and California law.  This action is proceeding on Plaintiff's complaint filed April 10, 2003, against Defendants Alameida, Terhune, Scribner, Yarborough, Glazier, Fischer, and Woods ("Defendants").  In his complaint, Plaintiff sets forth five claims for relief.  Claims one and two are due process claims, claim three is an equal protection claim, claim four is a state law claim based on violation of mandatory duties, and claim five is for failure to train and supervise.

///

On July 5, 2005, Defendants filed a motion for summary judgment. (Docs. 59-61.) Plaintiff filed an opposition on September 6, 2005,[1] and Defendants filed a reply and objections to some of Plaintiff's evidence on September 23, 2005.[2] (Docs. 63, 66, 67.) On February 3, 2006, Plaintiff filed two additional exhibits and a motion seeking leave to supplement his opposition with the exhibits. (Doc. 70.)

Plaintiff's motion is granted to the extent that the Court reviewed his additional exhibits. However, the Court does not rely on the exhibits in this Order, with the exception of use in establishing that Plaintiff is no longer in the SHU.  Reliance on the exhibits would not have changed the analysis set forth in this Order.

B.    Legal Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment

---

[1] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the court in an order filed on October 17, 2003.  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  (Doc. 12.)

[2] The Court reviewed Defendants' objections.  The Court declines to strike portions of Plaintiff's declaration and select exhibits.  However, evidence submitted by Plaintiff that is not admissible was not considered.

1  should be granted, "so long as whatever is before the district court demonstrates that the standard

2  for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

3      If the moving party meets its initial responsibility, the burden then shifts to the opposing

4  party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec.

5  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence

6  of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is

7  required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery

8  material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586

9  n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that

10 might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477

11 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630

12 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

13 return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

14 (9th Cir. 1987).

15     In the endeavor to establish the existence of a factual dispute, the opposing party need not

16 establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual

17 dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

18 trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce

19 the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

20 Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

21 amendments).

22     In resolving the summary judgment motion, the Court examines the pleadings, depositions,

23 answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c).

24 The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable

25 inferences that may be drawn from the facts placed before the Court must be drawn in favor of the

26 opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655

27 (1962) (per curiam). Nevertheless, inferences are not drawn out of the air, and it is the opposing

28 party's obligation to produce a factual predicate from which the inference may be drawn. Richards

3

v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

C.     Undisputed Facts

1.     Prison gangs present a serious threat to the safety and security of California prisons.

2.     Prison gang members are responsible for ongoing murders, assaults, and extortion, both inside and outside the prisons.

3.     California Department of Corrections and Rehabilitation (CDCR) intelligence reports have revealed that this small percentage of the inmate population is responsible for the majority of prison violence.

4.     Inmates who have elected to participate in prison gang activities have repeatedly proven to disrupt the orderly operations of prisons with unending violence.

5.     Confinement of validated prison gang affiliates in a Security Housing Unit (SHU) is necessary in order to maintain the orderly operation of mainline institutions statewide.

6.     The SHUs have proven invaluable to other prisons as a place for those inmates who refuse to refrain from prison-gang violence.

7.     The mere removal of prison gang members and associates reduces tension levels in and greatly benefits the general inmate populations.

8.     Inmates who choose to participate in prison gang activities and who are identified as such by Institutional Gang Investigators (IGI) will become the subject of an investigation into their gang activities.

9.     The CDCR currently recognizes seven prison gangs: The Mexican Mafia, the Aryan Brotherhood, the Black Guerilla Family, Nuestra Familia, Northern Structure, Texas Syndicate, and the Nazi Low Riders.

///

4

10. If an inmate is deemed to have met the requirements outlined in the California Code of Regulations, Title 15, § 3378, the inmate will be validated as a member or an associate of the prison gang.

11. Inmates validated as prison gang members or associates will be seen by a classification committee and placed into appropriate housing, i.e., a SHU.

12. The IGI initiates an investigation into an inmate's possible gang activities.

13. Under California Code of Regulations, Title 15, § 3378, an inmate can be validated as a gang member or associate based upon a minimum of three independent source items.

14. The sources are based on the following criteria:

•Self admission;

•Tattoos and symbols;

•Written material;

•Photographs;

•Staff information;

•Information from other agencies;

•Association with other gang affiliates;

•Information from informants;

•Prior gang-related crimes;

•Legal documentation;

•Receiving visits from known gang affiliates;

•Communication with other gang affiliates; and

•Information from debriefing reports.

15. A minimum of three source items is used to ensure the evidence has sufficient indications of reliability.

16. Prison gangs are extremely violent and pose a significant threat to the safety and security of prison employees, inmates, and civilians.  The danger posed to confidential informants, inmates seeking to disassociate with a gang, inmates perceived as weak links, and civilians who have provided information about gang activity is very serious.  It is not an exaggeration

to say that disclosure of this information would place these people at serious risk of violent attacks, perhaps resulting in death.

17.    The process of identifying and validating prison-gang members and associates is generally as follows: Inmates are identified by custody staff as potential prison gang members or associates based on their actions or behavior.  Custody staff then refer the information to the Institutional Gang Investigations Unit.  The IGI initiates an investigation into the inmate's possible gang activities.

18.    The assigned IGI is responsible for exercising due diligence in conducting the validation investigations and using his or her experience and discretion in determining the inmate's true gang involvement.

19.    When the IGI has completed the gang validation investigation on the inmate and has determined that sufficient evidence exists for gang validation, the investigator will conduct an interview with the inmate.

20.    The interview is intended to afford the inmate some notice of the gang validation and provide an opportunity to rebut the evidence supporting his prospective validation.

21.    The investigation and any additional follow-up investigation is documented and forwarded to the facility captain for review.

22.    The validation package is then forwarded to the Special Service Unit (SSU), Gang-Intel/Ops for review.

23.    A special agent assigned to that institution conducts a review of the entire validation investigation.

24.    If the reviewing special agent approves the package, the agent will validate the inmate, note the findings in writing, and then forward a copy to the inmate.

25.    If the reviewing agent disagrees, or feels that he needs additional information before he can make a decision, the agent will talk to the investigating officer or request additional information for clarification. If the agent feels that there is insufficient information to validate an inmate, he will reject the package.

///

26. The inmate is normally placed into an Administrative Segregation Unit pending this review for obvious safety and security reasons.

27. Following the validation, the Institutional Classification Committee (ICC) will determine the appropriate placement for the inmate.

28. Inmates validated as prison gang members or associates can be transferred out of the SHU under several circumstances. The three most common circumstances occur when the inmate disassociates himself from the gang (a process called "debriefing"), does not engage in gang-related activity for a period of six years, or is released on parole or discharged from custody.

29. An investigation was commenced to assess Plaintiff's prison gang involvement.

30. Defendant Woods was the IGI who performed the investigation.

31. On May 14, 1998, while searching the personal property of Plaintiff, Defendant Woods found an address book.

32. On June 8, 1998, Defendant Woods completed the investigation of Plaintiff for the purpose of his alleged gang involvement.

33. Defendant Woods reviewed the evidence and made a conclusion that there was sufficient evidence that Plaintiff was a member or associate of the Mexican Mafia.

34. Defendant Woods then prepared a prison gang validation package, along with the supporting evidence.

35. The gang validation package for Plaintiff included three source items: Plaintiff's address book and two confidential memoranda.

36. Defendant Woods submitted Plaintiff's gang validation package, as well as the supporting evidence, to his supervisor, Defendant Glazier, for review, and Defendant Glazier agreed with Defendant Woods that there was sufficient evidence that Plaintiff was a member or an associate of the Mexican Mafia.

37. Plaintiff's prison gang validation package was sent to the SSU/Law Enforcement Investigations Unit (LEIU) in Sacramento for review.

///

///

38.     On June 30, 1998, after having reviewed the gang validation package regarding Plaintiff, Defendant Fischer, an SSU/LEIU agent, approved Plaintiff's validation as a member of the Mexican Mafia prison gang.

39.     On July 6, 1998, Plaintiff was issued a Segregated Housing Order (CDC Form 114D) informing him that he was being retained in administrative segregation (Ad-Seg) because he had been validated as a prison gang member.

40.     On July 16, 1998, an Institutional Classification Committee (ICC) hearing was held to review the continued retention of Plaintiff in Ad-Seg, as well as consider appropriate housing for Plaintiff given his prison gang validation.

41.     Plaintiff appeared before the Committee on July 16, 1998.

42.     The Committee recommended Plaintiff's placement in a SHU because of his prison gang validation.

43.     On August 18, 1998, Plaintiff was endorsed by a classification services representative (CSR) for an indeterminate SHU term.

44.     Plaintiff appealed his prison gang validation by submitting an inmate grievance form 602, which he pursued to the Director's Level.

45.     On March 22, 1999, Plaintiff was transferred from Ad-Seg at CSP-Lancaster to a SHU at CSP-Corcoran.

46.     An inmate placed in a SHU will be reviewed by a Unit Classification Committee (UCC) at least every 180 days for consideration for release to the general population.

        D.      Due Process Claim - Gang Validation and Imposition of SHU Term[3]

        Plaintiff alleges a due process claim stemming from his validation as a member of the Mexican Mafia and resulting assessment of an indeterminate Security Housing Unit term.  Plaintiff alleges various procedural deficiencies and a lack of evidence supporting the validation.  At the outset, the Court notes that Plaintiff takes issue with many of the aspects of his validation and cites

---

[3] Identified in Plaintiff's complaint as First Cause of Action (State Created Liberty Interest) and Second Cause of Action (Federal Due Process).  The claim is one for deprivation of a protected liberty interest without due process of law, rather than two separate claims.

frequently to Title 15 of the California Code of Regulations in support of his allegations. However, Plaintiff is pursuing a claim under section for 1983 for violation of his rights under the Due Process Clause of the Fourteenth Amendment of the United States Constitution. The provision for certain procedural protections under state law does not work to enlarge the protections Plaintiff is due under federal law, which as discussed below are fairly minimal. See Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997). Further, numerous times Plaintiff references CDCR's failure to comply with settlements and injunctions in other cases. The violation of consent decrees, settlements, and injunctions in other cases does not provide a basis upon which to impose liability on Defendants in this action. See Frost v. Symington, 197 F.3d 348, 353 (9th Cir. 1999) (district court characterized inmate's damages claim as one alleging violations of his First Amendment rights as opposed to alleging a breach of consent decree); Hart v. Cambra, No. C 96-0924 SI, 1997 WL 564059, *5 (N.D. Cal. Aug. 22, 1997) ("The failure of San Quentin prison staff to comply with the injunction issued by the district court in *Toussaint* would not alone be actionable under Section 1983 because remedial orders, such as the *Toussaint* injunction, do not create 'rights, privileges or immunities secured by the Constitution and the laws' of the United States.") (quoting Green v. McKaskle, 788 F.2d 1116, 1123-24 (5th Cir. 1986)); Coleman v. Wilson, 912 F.Supp. 1282, 1294 (E.D. Cal. 1995) (resolution of issues in Gates v. Deukmejian, No. CIV S- 87-1636 LKK JFM, 1988 WL 92568 (E.D. Cal. 1988) governed by Gates consent decree while issues in instant case governed by standards applicable to claims brought under Eighth Amendment)).

The Due Process Clause protects against the deprivation of liberty without due process of law. Wolff v. McDonnell, 418 U.S. 539, 556 (1974). In order to invoke the protection of the Due Process Clause, a plaintiff must first establish the existence of a liberty interest for which the protection is sought. Liberty interests may arise from the Due Process Clause itself or from state law. Wilkinson v. Austin, 125 S.Ct. 2384, 2393 (2005). The Due Process Clause itself does not confer on Plaintiff a liberty interest in avoiding "more adverse conditions of confinement." Wilkinson, 125 S.Ct. at 2393; Hewitt, 459 U.S. at 466-68. Under state law, the existence of a liberty interest created by prison regulations is determined by focusing on the nature of the deprivation. Sandin v. Conner, 515 U.S. 472, 481-84 (1995). Such interests are limited to freedom from restraint

which "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484.

In this instance, Defendants concede that in light of the Supreme Court's decision in Wilkinson, Plaintiff had a protected liberty interest in avoiding confinement in the SHU. Wilkinson, 125 S.Ct. at 2394-95. The Court, too, will presume for the purposes of this motion that there was a protected liberty interest at stake. The issue then is whether Plaintiff received the process he was due.

Although Plaintiff contends otherwise, the assignment of validated gang members and associates to the SHU is an administrative measure rather than a disciplinary measure, and is "essentially a matter of administrative discretion." Bruce v. Ylst, 351 F.3d 1283, 1287 (9th Cir. 2003) (quoting Munoz v. Rowland, 104 F.3d 1096, 1098 (9th Cir. 1997)). As such, Plaintiff is entitled to the minimal procedural protections set forth in Toussaint, namely adequate notice, an opportunity to be heard, and periodic review. Bruce, 351 F.3d at 1287 (citing to Toussaint v. McCarthy, 801 F.2d 1080, 1100-01 (9th Cir. 1986)). In addition to these minimal protections, there must be "some evidence" supporting the decision. Id. (citing Superintendent v. Hill, 472 U.S. 445, 454 (1985)). Plaintiff challenges both the procedural protections provided and the evidence used against him.

### 1.   Pre-Deprivation Procedures

Turning first to the procedural protections, Plaintiff is entitled to "an informal nonadversary hearing within a reasonable time" after segregation, notice of the charges or reasons for segregation, and an opportunity to present his views. Toussaint, 801 F.2d at 1100. Plaintiff is not entitled to detailed written notice, representation, the opportunity to present witnesses, or a written decision regarding the reasons for placement. Id. at 1100-01. Further, "due process does not require disclosure of the identity of any person providing information leading to the placement . . . in . . . segregation." Id. at 1101.

Defendant Woods conducted the investigation to assess Plaintiff's gang involvement, and on May 14, 1998, searched Plaintiff's cell in the course of this investigation. (Undisputed Facts 29-31.) Defendants contend that the two address books found contained known Mexican Mafia mail

drop addresses and validated Mexican Mafia associates. (Fischer Dec., ¶18b; Woods Dec., ¶17.) Defendants contend that the information was documented in a chrono (CDC Form 128-B) and Plaintiff was provided with a copy. (Woods Dec., 17.)  In addition to the address books, Defendants contend that two confidential investigative reports substantiated Plaintiff's involvement in the Mexican Mafia.  (Fischer Dec., ¶18; Woods Dec., ¶18.)  On June 8, 1998, Defendant Woods completed the investigation of Plaintiff for the purpose of his alleged gang involvement.  (U.F. 32.) Defendant Woods reviewed the evidence and concluded that there was sufficient evidence that Plaintiff was a member or associate of the Mexican Mafia, and prepared a prison gang validation package, along with the supporting evidence, which included the three independent source items. (U.F. 34-35.) Defendant Woods submitted Plaintiff's gang validation package to Defendant Glazier, his supervisor, for review, and Defendant Glazier agreed that there was sufficient evidence that Plaintiff was a member or associate of the Mexican Mafia.  (U.F. 36.)

Defendants contend that Defendant Woods then interviewed Plaintiff to afford him an opportunity to rebut the evidence supporting his prospective validation.  (Woods Dec., ¶30.) Defendants contend that Defendant Woods provided Plaintiff with a copy of a chrono he authored on June 8, 1998, in which he identified the source items that were being used to validate Plaintiff's gang affiliation, and provided a copy of the CDC 1030 forms (Notice of Confidential Information Disclosure Form).  (Woods Dec., ¶31-32.)   Defendants contend that Defendant Woods had originally served Plaintiff with a CDC 1030 form on May 19, 1998, disclosing a confidential memorandum dated May 19, 1998, in which Plaintiff was identified as a member of the Mexican Mafia.  (Woods Dec., ¶32.)  Defendants contend Defendant Woods re-served this same CDC 1030 form on July 21, 1998, and again on August 13, 1998.  (Woods Dec., ¶32.) Defendants contend that a CDC 1030 form, which disclosed a confidential memorandum dated March 29, 1993, identifying Plaintiff as being an associate of the Mexican Mafia, was initially provided to Plaintiff in 1993, and that Defendant Woods re-served the same form on Plaintiff on July 21, 1998, and also on August 13, 1998.  (Woods Dec., ¶32.)  Defendants contend that after Plaintiff later claimed that he did not receive the chrono identifying the source documents used in the validation process, to avoid any further confusion, Defendant Woods had these documents served on Plaintiff again on August 13,

1998, and also had Plaintiff sign a chrono indicating that he had received the two CDC 1030 forms (confidential disclosure forms) dated March 29, 1993, and May 19, 1998, and a copy of the CDC 128B Chrono dated May 15, 1998.  (Woods Dec., ¶33.)

Plaintiff's prison gang validation package was sent to the SSU/Law Enforcement Investigations Unit (LEIU) in Sacramento for review, and on June 30, 1998, after having reviewed the gang validation package regarding Plaintiff, Defendant Fischer, an SSU/LEIU agent, approved Plaintiff's validation as a member of the Mexican Mafia prison gang. (U.F. 38.) Defendants contend that a copy of the June 30, 1998, validation approval was provided to Plaintiff.  (Fischer Dec., ¶19.)

On July 6, 1998, Plaintiff was issued a Segregated Housing Order (CDC Form 114D) informing him that he was being retained in administrative segregation (Ad-Seg) because he had been validated as a prison gang member.  (U.F. 39.)  Defendants contend that Plaintiff was again provided the Confidential Information Disclosure Forms (CDC 1030 forms).  (Exhibit O.)  On July 16, 1998, an ICC hearing was held to review the continued retention of Plaintiff in Ad-Seg, as well as consider appropriate housing for Plaintiff given his prison gang validation.  (U.F. 40.) Defendants contend that Plaintiff appeared before the Committee on July 16, 1998, to present his views about his prison gang member validation and his housing in Ad-Seg.  (U.F. 41; Exhibit P.)  The Committee recommended Plaintiff's placement in a Security Housing Unit because of his prison gang validation, and on August 18, 1998, Plaintiff was endorsed by a classification services representative (CSR) for an indeterminate SHU term.  (U.F. 43.)

Defendants argue that Plaintiff was afforded notice of the reasons for considering segregation, was provided with the opportunity to present his views before the IGI, and was afforded a hearing.  Based on these procedures, Defendants argue that Plaintiff received all the process he was due in a situation such as this where the segregation was administrative in nature.

Defendants acknowledge that it is the IGI who is the decision maker with respect to validation of inmates as gang members or associates.  (Motion, 16:5-12.)  Due process requires that Plaintiff be provided with an opportunity to present his view to the IGI.  Toussaint v. McCarthy, 926 F.2d 800, 803 (9th Cir. 1991).  In this instance, the IGI was Defendant Woods and Plaintiff disputes that he was interviewed by Woods prior to his validation.  The Court notes that although Defendants

contend Plaintiff was interviewed by Defendant Woods concerning his validation and provided with the opportunity to be heard prior to validation, they do not identify when the interview allegedly took place. (Woods Dec., ¶30.) Even if they had specified an interview date prior to Plaintiff's validation, however, Plaintiff refutes this and contends that his classification hearing held on July 16, 1998, was the first opportunity he was given to be heard. (Opp., 21:6-11, 34:2-4.[4]) At that point, Plaintiff had already been validated as a gang member and he was assessed an indeterminate SHU term at that time.

There is a dispute of fact between the parties over whether Plaintiff was provided with notice and the opportunity to be heard by Defendant Woods prior to his validation. Viewing the evidence in the light most favorable to Plaintiff, Plaintiff was first provided notice on July 6, 1998, when he was issued the order informing him that he was being placed in and retained in Ad-Seg because he had been validated as a member of the Mexican Mafia, and was first provided the opportunity to be heard on July 16, 1998, when he appeared before the Institutional Classification Committee for an initial hearing on his Ad-Seg placement and for yard review. The ICC elected to refer Plaintiff to the CSR with the recommendation that Plaintiff be transferred to Pelican Bay State Prison to serve an indeterminate SHU term based on Plaintiff's membership in the Mexican Mafia. (Ds' Ex. P.) "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner," Mathews v. Eldridge, 424 U.S. 319 (1976) (internal quotations and citations omitted), and in order to enjoy the right to be heard, notice must first be given. Wilkinson, 125 S.Ct. at 2396. Neither the notice of placement in Ad-Seg issued on July 6, 1998, nor the hearing held on July 16, 1998 before the ICC satisfied the minimal procedural due process protections Plaintiff was entitled to with respect to his validation as a member of the Mexican Mafia, as by the time those events occurred, Plaintiff had already been validated. The Court finds that the disputed issues of fact between the parties preclude Defendants from entitlement to summary adjudication on this issue of whether Plaintiff received constitutionally adequate pre-deprivation process.

---

[4] For the purpose of this motion, statements set forth in Plaintiff's complaint and opposition that are within Plaintiff's personal knowledge are treated as opposing affidavits. See Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998).

2.   Evidence Used to Validate Plaintiff

Turning to the "some evidence" standard, the Court is not to "examine the entire record, independently assess witness credibility, or reweigh the evidence; rather 'the relevant question is whether there is any evidence in the record that could support the conclusion.'" Bruce at 1287 (quoting Superintendent, 472 U.S. at 455-56).  However, although discussed in the context of a disciplinary hearing, the Ninth Circuit has stated that under the Hill standard, the evidence should have some indicia of reliability.  Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987).

While Title 15 regulations provide for three pieces of evidence, under federal law, one piece of evidence may be sufficient to meet the "some evidence" standard. Bruce at 1288.  In this instance, Defendants did not provide the confidential memoranda as evidence and therefore, only the address book source item is before the Court for review.

Defendants contend that the address book retrieved during a search of Plaintiff's cell contained the names of several validated Mexican Mafia members and/or associates, as well as two addresses of known third-party mail drops for the Mexican Mafia, and that this information was a non-confidential source which was confirmed by other independent sources.  (Ds' Ex. D (Fischer Dec. ¶18b); Ex. E (Woods Dec. ¶27); Ex. J; Ex. L; Ex. M).

The three names, with accompanying addresses, set forth as Mexican Mafia associates and mail drops are Alfredo Ruiz, Domingo Luquin, and Paul Portillo.  (Ds' Ex. L, M.)  Plaintiff submits evidence that Ruiz's name was not in his address book, that he does not know Ruiz, and that there is no documentation that he ever corresponded with Ruiz.  (P's Ex. D, p.74; Opp., 4:9-13.)  Plaintiff submits evidence that Luquin's name was not written in his address book and that there is no documentation that he ever corresponded with Ruiz, and Plaintiff contends that the name and address are fabricated.  (P's Ex. D, p.74; Opp., 4:14-19.)  Finally, Plaintiff contends that he knew Portillo in 1995-1996, approximately, from the general population yard at Corcoran, from where Portillo paroled.  Plaintiff contends that Portillo was not validated at the time Plaintiff knew him, as evidenced by Portillo's presence on the general population yard, and that there is no documentation indicating that he and Portillo ever promoted or committed gang activity, or conspired to do so.  (P's Ex. D, p.79; Opp., 4:20-28.)  However, Plaintiff's evidence supporting his contention that he and

14

Portillo never promoted or committed gang activity, or conspired to do so references a Leon Portillo rather than a Paul Portillo. (P's Ex. D., p.79.) Therefore, with respect to Paul Portillo, the Court has before it only Plaintiff's evidence that Paul Portillo was not validated at the time Plaintiff knew him on the yard at Corcoran.

The Court disagrees with Defendants' contention in their reply that the address book is clearly sufficient to meet the "some evidence" standard, entitling them to summary adjudication. While under some circumstances, one source item such as this might be sufficient to satisfy the "some evidence" standard, the problem in this instance lies in whether or not that source item has some indicia of reliability.  Three names were identified via documentary evidence as Mexican Mafia drop or affiliates.  Plaintiff has submitted evidence, via Defendants' admissions, that two of the three names were not written in his address book and that there is an absence of CDCR documentation that he ever corresponded with either individual.  With respect to the third name, Plaintiff has submitted evidence that the individual was not validated at the time Plaintiff knew him. Other than maintaining that the address book is sufficient, Defendants do not address Plaintiff's specific contentions as to the three individuals.  Given Defendants' failure to address the issues raised by Plaintiff with respect to the three names, the Court cannot find that as a matter of law, the three names, two of which were not written in the address book, constitute "some evidence" *with an indicia of reliability*.  See Bruce, 351 F.3d at 1287-88 (sheriff's department report that inmate was a gang associate, probation report noting co-defendant on the inmate's underlying conviction was a validated gang member, or statement of confidential informant each sufficient, by itself, to meet standard because each had sufficient indicia of reliability); Barnett v. Centoni, 31 F.3d 813 (9th Cir. 1994) (guilty finding on prisoner disciplinary violation, affidavit, and confidential report with supporting documentation sufficient); Cato, 824 F.2d at 705 (inmate statement relayed to officials by a confidential informant with no firsthand knowledge of the statement and inconclusive polygraph results insufficient).  Accordingly, the Court finds that there exist disputed issues of fact with respect to whether or not Plaintiff's validation was supported by evidence sufficient to meet the Hill standard.

///

3.    Post-Deprivation Procedures

Finally, segregation "may not be used as a pretext for indefinite confinement," Toussaint, 801 F.2d at 1101 (quoting Hewitt v. Helms, 459 U.S. 460, 477 n.9 (1983)), and due process therefore requires that following Plaintiff's validation and confinement to the SHU, Plaintiff be given periodic reviews of his confinement which amount to more than "meaningless gestures." Toussaint, 801 at 1101-02.  Reviews at least every 120 hundred twenty days satisfy due process. Toussaint, 926 F.2d at 800.  Here, Plaintiff is challenging not the frequency of the reviews but the meaningfulness of the reviews.

An inmate placed in a SHU will be reviewed by a Unit Classification Committee (UCC) at least every 180 days for consideration for release to the general population. (U.F. 46.)  Defendants contend that since Plaintiff's placement in a SHU, a UCC hearing has been held at least every 180 days from the date of his endorsement (to consider and review his security housing unit), and an ICC hearing has also been held each year to consider and review Plaintiff's housing.  (Ds' Ex. C, T, U.) Defendants contend that Plaintiff concedes that he received prior notice of these hearings and was able to attend.  (Ds' Ex. C (Depo. Tx., pp. 126-132).)  Defendants contend that the ICC and UCC recommended Plaintiff's continued retention in a security housing unit because he was a validated member of the Mexican Mafia prison gang.  (Ds' Ex. T.)

Defendants contend that Plaintiff's prison gang validation package was regularly re-evaluated by an Institutional Gang Investigator.  (Ex. S.)  Defendants contend that on October 17, 2003, and April 2, 2004, a committee made up of LEIU staff reconfirmed Plaintiff's prison gang validation, and the committee reconfirmed Plaintiff's validation as a member of the Mexican Mafia.  (Ex. D (Fischer Decl. ¶22); Ex. R.) Defendants contend that on September 28, 2004, Plaintiff was validated by the LEIU as an inactive member of the Mexican Mafia, and has since been released from the SHU.  (Ex. D (Fischer Dec. ¶23); Ex. V.)

Plaintiff is challenging not the frequency of the reviews but the sufficiency of them.  Plaintiff contends that the reviews are meaningless because the ICC and UCC do not have the authority to release validated inmates to general population.  (Comp., 9:8-11.)  Plaintiff contends that although he was told during a hearing on April 15, 1999, that an IGI would resolve his issues, no meeting with

16

1  an IGI ever occurred. (Comp., 9:24-26; Opp., 5:21-27.) Plaintiff contends that pursuant to a policy

2  change on August 19, 1999, all validated SHU inmates were given a mandatory minimum six-year

3  term, and  all inmates must complete the minimum term before receiving consideration for release.

4  (Opp., 5:28-67.)

5          Plaintiff's argument that the 180 day reviews violate due process because inmates are not

6  allowed to set forth favorable evidence or call witnesses is without merit, as due process does not

7  necessarily require prison officials to provide such opportunities.  Toussaint, 801 F.2d at 1101.

8  However, as previously set forth, the reviews must be more than meaningless gestures.  Although

9  Defendants argue in their reply that Plaintiff has not set forth any evidence that the reviews were

10  meaningless, the Court disagrees.  Plaintiff has set forth evidence that neither the UCC nor the ICC,

11  the committees conducting the periodic reviews, had the authority to consider releasing Plaintiff

12  from the SHU, and that he did not receive a review before an IGI.  In addition to his own testimony,

13  Plaintiff submitted documentary evidence that following his classification hearing held on April 19,

14  1999, the committee was to refer him to an IGI, and documentary evidence of the changes to the

15  regulations effected August 19, 1999, which support his contention that the classification committees

16  were stripped of their discretion and authority to release validated inmate to the general population.

17  (P's Ex. E, F.)  In addition, Plaintiff submits an admission that the committee members conducting

18  the 180 day views do not have the authority to release validated members from the SHU.  (P's Ex.

19  D, p.72, RFA 8.)

20          Although Defendants have submitted evidence that Plaintiff's validation was reviewed

21  periodically by IGI, these reviews occurred on January 26, 1999, January 2, 2000, August 28, 2001,

22  October 12, 2001, July 18, 2002, August 25, 2003, and September 10, 2004. (Ds' Ex. S.) The Ninth

23  Circuit has approved periodic reviews of 120 days as sufficient, Toussaint, 926 F.2d at 803, and

24  expressed disapproval of annual reviews as not sufficiently protective of inmates' liberty interests.

25  Toussaint, 801 F.2d at 1101.  The Court declines to find as a matter of law that seven reviews in

26  approximately five years is sufficiently protective of the liberty interest at stake, particularly when

27  a number of the reviews were approximately a year apart.  Viewing the evidence in the light most

28  favorable to Plaintiff, the 180 day reviews were conducted by committees that did not have the

authority to make any changes to Plaintiff's validation and resulting housing assignment. The Court finds this is sufficient to give rise to a triable issue of fact regarding whether or not Plaintiff was provided with periodic reviews which amounted to more than meaningless gestures, in satisfaction of due process.

E.     Equal Protection Claim[5]

Plaintiff alleges that the gang validation policy is discriminatory because it targets Mexican inmates and because validated inmates do not have the same rights and privileges as other administratively segregated inmates. Defendants contend that the gang validation regulations are neutral on their face and apply to all prison gangs. Defendants contend that to the extent that Plaintiff is claiming the regulations are discriminatory in effect, there is no evidence of this. With respect to rights and privileges, Defendants contend that Plaintiff does not allege that he was treated differently from similarly situated inmates in the SHU.

"'To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class.'" Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001) (quoting Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998)). "Where the challenged governmental policy is 'facially neural,' proof of its disproportionate impact on an identifiable group can satisfy the intent requirement only if it tends to show that some invidious or discriminatory purpose underlies the policy." Lee, 250 F.3d at 687 (citing Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (264-66) (1977) (internal citations omitted)).

Plaintiff has set forth no argument that the regulations themselves are not neutral on their face. Rather, Plaintiff appears to be proceeding on the theory that the facially neutral regulations have a disproportionate impact on Mexican inmates and/or that the regulations are used by staff to

---

[5] Plaintiff alleges equal protection claims under federal and state law. The discussion of Plaintiff's federal constitutional claim resolves both the federal and state constitutional claims. Los Angeles County Bar Assoc. v. Eu, 979 F.2d 697, 705 (9th Cir. 1992) (citing Payne v. Superior Court, 132 Cal.Rptr. 405, 410 n. 3 (1976) (the California Constitution provides the same basic guarantee as the Fourteenth Amendment of the United States Constitution)).

discriminate against Mexican inmates.   Plaintiff has not submitted any admissible evidence supporting the claim that the regulations have a disproportionate impact, that a discriminatory purpose underlies the regulations, or that any of the Defendants intentionally discriminated against him based on his race.[6]

With respect to validated inmates not enjoying the same rights and privileges of other administratively segregated inmates, Plaintiff has not submitted any evidence that Defendants intentionally discriminated against Plaintiff based on his membership in a protected class.   Validated inmates do not form a protected class and Plaintiff has not submitted any evidence that validated inmates are treated differently than other similarly situated inmates.   Plaintiff's contention that validated inmates housed in the SHU are similarly situated to inmates housed in the Protective Housing Unit, but treated differently is not persuasive, and is unsupported by evidence that validated inmates housed in the SHU are in fact similarly situated to PHU inmates.   Accordingly, the Defendants are entitled to summary adjudication on Plaintiff's equal protection claims against them.

F.   Regulations Void for Vagueness and Overbreadth

In his complaint, Plaintiff alleges that the gang validation regulations and policies violate his equal protection rights because they are vague and overbroad.   Plaintiff's reliance on the Equal Protection Clause is misplaced.   A challenge for vagueness may arise when the regulation fails to clearly define its prohibitions and a challenge for overbreadth may arise when the regulation prohibits protected conduct.   Grayned v. City of Rockford, 408 U.S. 104, 108, 114-15 (1972).   The focus of a vagueness claim is whether the regulation "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits,' or '. . . . authorizes or even encourages arbitrary and discriminatory enforcement.'"   Gospel Missions of America v. City of Los Angeles, 419 F.3d 1042, 1047 (9th Cir. 2005) (quoting Hill v. Colorado, 530 U.S. 703, 732 (2000)). The focus of a claim for overbreadth is whether a regulation "sweeps within its prohibitions what may not be punished" under the Constitution.   Grayned, 408 U.S. at 115.   In the prison context, when

---

[6] Defendants object to Plaintiff's Exhibits I and J.   The exhibits lack foundation and are hearsay, and are not considered by the Court.   However, even if the Court had considered the exhibits, they would not have been sufficient to create a triable issue of fact concerning Plaintiff's equal protection claim.

regulations or policies are alleged to impinge up an inmate's protected rights, subject to certain exceptions not applicable here such as racial classifications, the regulation is analyzed under the test set forth in <u>Turner v. Safely</u>, 482 U.S. 78 (1987).  <u>Bahrampour v. Lampert</u>, 356 F.3d 969, 975-76 (9th Cir. 2004) (applying <u>Turner</u> test despite inmate's assertion that vagueness and overbreadth claims must be considered separate and apart from application of <u>Turner</u> test).

Although Defendants attempted to address these two claims as best they could under the circumstances, they did not set forth any argument that the regulations or policies satisfy the <u>Turner</u> test.  Plaintiff's bare allegations, reliance on the Equal Protection Clause, and failure to identify which protected he interest he believes was impinged upon undoubtably made their task of addressing the claims somewhat difficult.  After much consideration, the Court concludes that this claim must be dismissed because the allegations fall short of stating a claim.[7]  28 U.S.C. § 1915A. The Court is bound by Ninth Circuit authority to allow Plaintiff the opportunity to amend this claim. <u>Lopez v. Smith</u>, 203 F.3d 1122, 1130 (9th Cir. 2000) ("Leave to amend should be granted if it appears at all possible that the plaintiff can correct the defect." (internal citations omitted)).

Plaintiff is not required to amend, however, and may abandon these claims if he so chooses. The Court suggests Plaintiff review the legal standards very carefully, as vagueness and overbreadth claims are not intended to remedy regulations or policies that Plaintiff simply disagrees with.  Rather, they are intended to remedy regulations or policies that impermissibly infringe on a protected right. In the event that Plaintiff opts to amend, he may not add any new claims or new parties to this action. Any attempt to do so will result in an order striking the amended pleading and may result in the imposition of sanctions.  If Plaintiff amends, Defendants are relieved of their obligation to respond to the pleading until it is reviewed by the Court.  Finally, if Plaintiff amends, he must specify which regulations or policies he is challenging as vague and/or overbroad.  Rule 8 requires sufficient specificity to allow Defendants to respond to the claim(s).  In light of the fact that various regulations have changed over time since 1998, simply referring to gang regulations and policies and listing a

---

[7] The Court notes that in some instances, particularly in cases such as this where the complaint is lengthy, confusing, and filled with a multitude of allegations of misconduct, an attempt to flesh out a claim on summary judgments reveals that the claim is simply too awkward or deficient to lend itself to a proper analysis and must be dismissed.  Such is the case with these claims.

few only as examples is insufficient.  The Court and Defendants must be able to ascertain which policies and regulations Plaintiff is alleging are, or were, vague and overbroad.

Finally, if Plaintiff opts to amend, Local Rule 15-220 requires that an amended complaint be complete in itself without reference to any prior pleading.  As a  general rule, an amended complaint supersedes the original complaint.  See Loux v. Rhay, 375 F.2d 55, 57 (9th Cir. 1967).  Once plaintiff files an amended complaint, the original pleading no longer serves any function in the case.  Therefore, in an amended complaint, as in an original complaint, each claim and the involvement of each defendant must be sufficiently alleged.  In this instance, Plaintiff's amended complaint should include only those claims left at issue following this Order and should omit claims upon which Defendants have prevailed in their motion for summary judgment (e.g., Plaintiff's equal protection claims should be omitted).

G.     Violation of Mandatory Duties

In their motion, Defendants assert that Plaintiff's claim for violation of mandatory duties is not cognizable and appears to be a reiteration of Plaintiff's various due process claims.  (Motion, 30:7-13.)  There is some authority for the proposition that under California law, Plaintiff may be able to pursue a claim against Defendants for violation of Title 15 regulations.  See Joseph v. J.J. Mac Intyre Co., L.L.C., 238 F.Supp.2nd 1158 (N.D.Cal. 2002); South Bay Bldg. Enters., Inc. v. Riviera Lend-Lease, Inc., 85 Cal.Rptr.2d 647, 654 (Cal. Ct. App. 1999).  Because Defendants did not address this claim, other than to state that it was not cognizable and appeared to be subsumed under Plaintiff's other due process claims, Defendants shall be given the opportunity to file a dispositive motion addressing this claim.  A briefing schedule will be established by the Court after the issue of whether or not Plaintiff is going to amend his vagueness and overbreadth claims is resolved.

H.     Failure to Train and Supervise/Supervisory Liability

Defendants Terhune, Alameida, Scribner, Yarborough, and Glazier argue that they are entitled judgment on the claims against them because Plaintiff has set forth nothing more than conclusory allegations of liability.  Under section 1983, liability may not be imposed on supervisory personnel for the actions of their employees under a theory of respondeat superior.  When the named defendant holds a supervisorial position, the causal link between the defendant and the claimed

constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978), cert. denied, 442 U.S. 941 (1979). A claim for relief under section 1983 will lie against supervisory personnel only if they personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or promulgated or "implemented a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989) (internal citations omitted); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

In order to pursue claims against these Defendants under a theory of supervisory liability, there must first exist underlying claims based on violations of Plaintiff's rights.  In this instance, the Court found that there exist factual disputes as to whether Plaintiff received notice and an opportunity to be heard prior to his validation, whether some evidence with an indicia of reliability existed to support Plaintiff's validation, and whether Plaintiff received periodic reviews that were more than meaningless gestures.  However, the Court found that Defendants are entitled to judgment as a matter of law on Plaintiff's equal protection claims.  Further, Plaintiff's void for vagueness and overbreadth claims must be dismissed, with leave to amend.  Thus, on the summary judgment motion, the Court shall look to whether Plaintiff has set forth sufficient evidence linking Defendants to his due process claim.

Plaintiff asserts that Defendant Glazier was responsible for coordinating the investigation against Plaintiff, that Glazier "secured" and "authorized" Plaintiff's validation, that Glazier failed to provide Plaintiff with notice and an opportunity to be heard concerning his validation, and that Glazier forwarded a gang validation package to LEIU that was not support by some evidence. (Comp., ¶¶6, 19, 23, 24; Opp., 53:22-54:16.)  In addition, a number of exhibits before the Court establish Glazier's involvement in the process.  (Ds' Ex. J, L, M, N.)  This is sufficient to support a claim that Defendant Glazier was personally involved in the validation of Plaintiff without due process of law.

Plaintiff asserts that Defendant Yarborough assessed the indeterminate SHU term against him, and failed to provide him with notice and a meaningful opportunity to be heard concerning his

validation. (Comp., ¶¶8, 24, 31; Opp., 2:25-28 & 55:19-24.) Plaintiff also contends that during the hearing held on July 16, 1998, he told Defendant Yarborough he did not know how he could be validated and requested the gang validation package, which, viewed in the light most favorable to Plaintiff, gives rise to an inference that Defendant Yarborough was on notice of the alleged procedural deficiencies. (Opp., 36:3-10.) These contentions are sufficient to support a claim that Defendant Yarborough was personally involved in the deprivation of Plaintiff's protected liberty interest without due process of law.

Both Defendant Glazier and Defendant Yarborough were involved in the very process at issue in this action - the validation of Plaintiff and the assessment of an indeterminate SHU term. As such, Defendants' argument that Plaintiff is attempting to impose liability on them based on a theory of respondeat superior is unpersuasive. Plaintiff's deposition responses, cited to by Defendants, do not compel a contrary finding. The Court notes that even if Plaintiff had made statements in his deposition indicating a complete lack of involvement, which he did not, the Court would still be required to consider that which is set forth in Plaintiff's complaint and opposition.

Plaintiff's claim against Defendant Scribner, who was the warden of Corcoran, is based on Scribner's decision not to allow Plaintiff to retain certain privileges in the SHU that inmates in administrative segregation are allowed to retain. (Comp., ¶32.) Defendants are entitled to judgment on Plaintiff's equal protection claims and Plaintiff does not set forth any evidence in his opposition concerning Defendant Scribner's involvement in due process claim stemming from his validation and assessment of a SHU term, both of which occurred at Lancaster rather than Corcoran. Further, Plaintiff has set forth no evidence that Defendant Scribner was involved in the periodic reviews that were allegedly not meaningful. Indeed, in the section of his opposition devoted to addressing Defendants' arguments with respect to supervisory liability, Plaintiff does not raise any issues concerning Defendant Scribner. (Opp., 53:12-59:18.) Accordingly, the Court finds that Defendant Scribner is entitled to judgment as a matter of law as to the claim that Plaintiff was validated and confined in the SHU without due process of law.

Finally, Defendants Alameida and Terhune are former Directors of the California Department of Corrections and Rehabilitation. The record is devoid of any argument or allegation that

Defendants Alameida and Terhune were personally involved in the validation, assessment of a SHU term, and periodic reviews. In order to create a triable issue of fact, Plaintiff must set forth some evidence that Defendants either knew of the violations and failed to prevent them, or enacted policies that led to the violations. Conclusory allegations that Defendants were involved or responsible are insufficient.

In his complaint, Plaintiff alleges that Defendants Terhune and Alameida promulgated and implemented the rules and regulations that went into effect on August 19, 1999. (Comp., ¶55.) As set forth in subsection D3, it was pursuant to these changes that the committees periodically reviewing Plaintiff's segregation were stripped of the authority to take any action, rendering the periodic reviews meaningless. This is sufficient to create a triable issue of fact with respect to a claim against Defendants Terhune and Alameida stemming from the periodic reviews Plaintiff alleges failed to comport with due process.

However, Plaintiff has set forth no evidence sufficiently linking either Defendant to the due process violations relating to his validation and the assessment of the SHU term. Plaintiff's argument that Defendant Alameida was on notice of the violations by virtue of Plaintiff's inmate appeal is unpersuasive. (Opp., 57:5-9.) To the extent that reviewing and responding to an appeal might be a sufficient basis upon which to argue that notice of the constitutional violations occurred, a review of Plaintiff's inmate appeal demonstrates that Defendant Alameida did not personally respond. (P's Exhibit S.) Any argument that Defendant Alameida is responsible because the appeal was answered by staff on his behalf is precluded because liability may not be imposed on Defendant on this basis. Generally, there is no respondeat superior liability under Section 1983. Jones v. Williams, 297 F.3d 930, 934 (9th Cir.2002). Accordingly, Defendants Terhune and Alameida are entitled to judgment as a matter of law on Plaintiff's due process claim stemming from his validation and SHU term assessment, but not on Plaintiff's due process claim stemming from the allegedly meaningless periodic reviews.

I.    Qualified Immunity

Defendants also argue that they are entitled to qualified immunity, which shields government officials from civil damages unless their conduct violates "clearly established statutory or

24

constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). If, and only if, a violation can be made out, the next step is to ask whether the right was clearly established. Id. In determining whether the right was clearly established, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." Id. "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 202 (internal quotations and citation omitted). In resolving these issues, the Court must view the evidence in the light most favorable to Plaintiff and resolve all material factual disputes in favor of Plaintiff. Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

Defendants' argument that they are entitled to qualified immunity because in following and enforcing state regulations, Defendants could have reasonably believed their conduct was lawful is unavailing. Plaintiff was validated and assessed an indeterminate SHU term in 1998, and the periodic reviews of his SHU confinement were conducted thereafter. By 1998, the law was clearly established in this Circuit that at a minimum, federal due process required Plaintiff be given notice and a meaningful opportunity to heard before he was validated, that "some evidence" support the decision, and that Plaintiff be provided with periodic reviews that were more than meaningless gestures.[8] Toussaint, 926 F.2d at 802-03; Cato, 824 F.2d at 705; Toussaint, 801 F.2d at 1098-1101.

Although it is Defendants' position that they complied with the regulations, policies, and procedures which provided that inmates undergoing the validation process be given notice and an opportunity to be heard by a gang investigator prior to validation, Plaintiff disputes that this procedure was followed in his case. Viewing the evidence in the light most favorable to Plaintiff, Defendants Woods, Glazier, and Fischer validated Plaintiff as a gang member without giving him

---

[8] Defendants do not argue otherwise. Rather, they argue only that they could reasonably have believed it was lawful to follow regulations.

notice and an opportunity to be heard, and Defendant Yarborough assessed Plaintiff an indeterminate SHU term based on that validation, despite being placed on notice that Plaintiff had been validated without first receiving sufficient process under federal law. Further, again as viewed in the light most favorable to Plaintiff, Defendants Terhune and Alameida were involved in the promulgation and implementation of regulations in 1999 that stripped the committees conducting the periodic reviews of Plaintiff's segregation of the ability to take any action in terms of releasing Plaintiff from segregation. By the time of the events in question, the law was sufficiently clear that a reasonable official would have understood that such actions ran afoul of due process under federal law. Accordingly, Defendants' motion for summary adjudication on Plaintiff's due process claim on qualified immunity grounds is denied.

J.     Plaintiff's Injunctive Relief Claims

Finally, Defendants argue that Plaintiff's claims for injunctive relief should be denied because the gang validation regulations did not violate Plaintiff's rights, Plaintiff has been released from the SHU, and Plaintiff cannot request that CDCR never again rely on the source items used to validate him. Since the filing of the motion for summary judgment and opposition thereto, Plaintiff was released from the SHU at Corcoran and transferred to High Desert State Prison in Susanville. (Docs. 69, 70.) Accordingly, Plaintiff's request for injunctive relief mandating his release from the SHU is moot. Dilley v. Gunn, 64 F.3d 1365, 1368 (9th Cir. 1995); Johnson v. Moore, 948 F.2d 517, 519 (9th Cir. 1991). Further, pursuant to Bruce v. Ylst, this Court cannot issue an order foreclosing the use of the source items at issue in this action against Plaintiff in the future. Bruce, 351 F.3d at 1290.

With respect to anything further, the Court finds Defendants' argument to be premature. In light of the fact that Plaintiff's void for vagueness and overbreadth claims are being dismissed with leave to amend and Plaintiff's state law claim was not addressed, it is not at all clear which claims will remain in this action, following amendment and/or another dispositive motion. The Court declines to issue an order at this stage narrowing further or precluding completely Plaintiff's injunctive relief claims, as such an action would require speculation concerning what the claims will be, which issues Plaintiff may or may not prevail upon, and what relief might be appropriate under

any number of circumstances.

K.      Conclusion

Based on the foregoing, it is HEREBY ORDERED that:

1.      Plaintiff's motion for leave to supplement his opposition, filed February 3, 2006, is GRANTED to the extent that the Court reviewed the exhibits;

2.      Defendants' motion for summary judgment, filed July 5, 2005, is GRANTED IN PART and DENIED IN PART as follows:

   a.      Defendants' motion for summary adjudication on Plaintiff's due process claim stemming from his validation and confinement in the SHU is DENIED;

   b.      Defendants' motion for summary adjudication on Plaintiff's equal protection claim(s) is GRANTED;

   c.      Defendant' motion for summary adjudication on Plaintiff's due process claim against Defendant Scribner stemming from Plaintiff's validation and confinement in the SHU is GRANTED;

   d.      Defendant' motion for summary adjudication on Plaintiff's due process claim against Defendants Terhune and Alameida is GRANTED as it pertains to Plaintiff's validation and assessment of a SHU term and DENIED as it pertains to Plaintiff's periodic reviews of his SHU confinement;

   e.      Defendants' motion for summary adjudication on Plaintiff's due process claim stemming from his validation and confinement in the SHU based on qualified immunity is DENIED; and

   f.      Plaintiff's injunctive relief claims for an order releasing him from the SHU and prohibiting the future use of the three source items used to validated him are DISMISSED; and

3.      Plaintiff's void for vagueness and overbreadth claims are dismissed, with leave to amend, for failure to state a claim;

4.      Plaintiff may, but is not required to, amend his void for vagueness and overbreadth claims;

27

5.   If Plaintiff wishes to amend his void for vagueness and overbreadth claims, he must file an amended complaint within **thirty (30) days** from the date of service of this order;

6.   Plaintiff may not add any new claims or defendants in his amended complaint;

7.   If Plaintiff opts to file an amended complaint, Defendants are relieved of their obligation to respond pending review of an amended complaint by the Court;

8.   If Plaintiff does not file an amended complaint within thirty days, the Court shall set a deadline for Defendants to file a dispositive motion addressing Plaintiff's state law claim, if Defendants choose to do so; and

9.   This matter is referred back to the Magistrate Judge for further proceedings consistent with this Order.

IT IS SO ORDERED.

**Dated:    March 29, 2006**            **/s/ Anthony W. Ishii**
9h0d30                                                      UNITED STATES DISTRICT JUDGE