1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9  BENNY TAPIA,                                    CASE NO. 1:03-cv-05422-LJO-SMS PC

10                    Plaintiff,                   **AMENDED PRETRIAL ORDER**

11        v.                                       <u>Jury Trial:</u>    **March 3, 2008, at 8:30 a.m. in**
                                                                        **Courtroom 4 (LJO)**
12  WOODS, GLAZIER, FISCHER,
    YARBOROUGH, TERHUNE,                           **WRITTEN OBJECTIONS DUE ON OR**
13  AND ALAMEIDA,                                  **BEFORE NOVEMBER 5, 2007**

14                    Defendants.
                                         /
15

16        Plaintiff Benny Tapia ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis

17  in this civil rights action filed pursuant to 42 U.S.C. § 1983 for violation of Plaintiff's rights under

18  the United States Constitution.  This action is proceeding on Plaintiff's complaint, filed April 10,

19  2003, on the remaining claims that Defendants Yarborough, Glazier, Fischer, and Woods violated

20  Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment in conjunction with

21  Plaintiff's gang validation and confinement in the Security Housing Unit, and that Defendants

22  Alameida and Terhune violated Plaintiff's rights under the Due Process Clause of the Fourteenth

23  Amendment with respect to the sufficiency of the periodic reviews of Plaintiff's Security Housing

24  Unit confinement.

25        The parties have submitted pretrial statements.  Having reviewed the statements and the

26  remainder of the file, the Court now issues the instant Pretrial Order.

27  ///

28  ///

1

I.    Jurisdiction and Venue

       The Court has subject matter jurisdiction over this federal civil rights action.  28 U.S.C. § 1331.  Venue is proper because the conduct allegedly occurred in this judicial district.

II.   Jury Trial

       The parties request trial by jury.

III.  Facts[1]

       A.    Undisputed Facts

1.    Prison gangs present a serious threat to the safety and security of California prisons.

2.    Prison gang members are responsible for ongoing murders, assault, and extortion, both inside and outside the prisons.

3.    Prison gangs are extremely violent and pose a significant threat to the safety and security of prison employees, inmates, and civilians.  The danger posed to confidential informants, inmates seeking to disassociate with a gang, inmates perceived as weak links, and civilians who have provided information about gang activity is very serious.  Disclosure of this information would place these people at serious risk of violent attacks resulting in death or great bodily harm.

4.    California Department of Corrections and Rehabilitation (CDCR) intelligence reports have revealed that this small percentage of the inmate population is responsible for the majority of prison violence.

5.    Inmates who have elected to participate in prison gang activities have repeatedly proven to disrupt the orderly operations of prisons with unending violence.

6.    Confinement of validated prison gang affiliates in a Security Housing Unit (SHU) is necessary in order to maintain the orderly operation of mainline institutions statewide.

///

_____

[1] Some proposed undisputed and disputed facts offered by Plaintiff do not appear to have any relevance to his claims and have been omitted from the Pretrial Order.  At issue are whether Plaintiff was validated by Defendants as a gang associate and assessed an indeterminate SHU term without the due process protections he was due under federal law, and whether Defendants provided Plaintiff with periodic reviews of his SHU confinement that comported with federal due process protections.  Issues such as whether CDCR reached a settlement in another civil case or whether prisoners went on a hunger strike to protest CDCR's gang policy have no apparent relevance to Plaintiff's legal claims.

7.    The SHUs have proven invaluable to other prisons as a place for those inmates who refuse to refrain from prison-gang violence.

8.    The mere removal of prison gang members and associates reduces tension levels in and greatly benefits the general inmate populations.

9.    Inmates who choose to participate in prison gang activities and who are identified as such by Institutional Gang Investigators (IGI) will become the subject of an investigation into their gang activities.

10.    The CDCR currently recognizes seven prison gangs:  The Mexican Mafia, the Aryan Brotherhood, the Black Guerilla Family, Nuestra Familia, Northern Structure, Texas Syndicate, and the Nazi Low Riders.

11.    If an inmate is deemed to have met the requirements outlined in title 15, section 3378 of the California Code of Regulations, the inmate will be validated as a member or an associate of the prison gang.

12.    Under prison regulations, inmates validated as prison gang members or associates will be seen by a classification committee and placed into appropriate housing (e.g., a SHU).

13.    The IGI initiates an investigation into an inmate's possible gang activities.

14.    Title 15, section 3378(c)(2) of the California Code of Regulations sets forth that an inmate can be validated as a gang member or associate based upon a minimum of three independent source items.

15.    The independent source documents may be based upon self-admission, tattoos and symbols, written material, photographs, staff information, information from other agencies, association with other gang affiliates, information from informants, prior gang-related crimes, legal documentation, receiving visits from known gang affiliates, communication with other gang affiliates, and information from debriefing reports.

16.    A minimum of three source items is used to ensure the evidence has sufficient indications of reliability.

17.    The process of identifying and validating prison-gang members and associates is generally as follows:  Inmates are identified by custody staff as potential prison gang members or associates

based on their actions or behavior.  Custody staff then refer the information to the Institutional Gang Investigations Unit.  The IGI initiates an investigation in the inmate's possible gang activities.

18.     When the IGI has completed the gang validation investigation on the inmate and has determined that sufficient evidence exists for gang validation, the investigator will conduct an interview with the inmate.

19.     The interview is intended to afford the inmate some notice of the gang validation and provide an opportunity to rebut the evidence the evidence supporting his prospective validation.

20.     The investigation and any follow-up investigation is documented and forwarded to the IGI's supervisor for review.

21.     The validation package is then forwarded to the Special Services Unit/Law Enforcement and Investigations Unit (SSU/LEIU) for review.

22.     A special agent assigned to that institution conducts a review of the validation investigation.

23.     If the reviewing special agent approves the package, the agent will note the findings in writing, and then forward a copy to the inmate.

24.     If the reviewing agent disagrees or feels that additional information is required, the agent will talk to the investigating officer or request additional information for clarification.  If the agent feels that there is insufficient information to validate an inmate, he will reject the package.

25.     The inmate is normally placed into an Administrative Segregation Unit pending this review for safety and security reasons.

26.     Following the validation, the Institutional Classification Committee (ICC) will determine the appropriate placement for the inmate.

27.     Inmates validated as prison gang members or associates can be transferred out of the SHU under several circumstances.  The three most common circumstances occur when the inmate disassociates himself from the gang (a process called "debriefing"), does not engage in gang-related activity for a period of six years, or is released on parole or discharged from custody.

28.     An investigation was commenced to assess Plaintiff's prison gang involvement.

29.     Defendant Woods was the IGI at California State Prison-Lancaster who performed the investigation.

30.     On May 14, 1998, while searching the personal property of Plaintiff, Woods found two address books and a scrap piece of paper in one of the address books.

31.     After reviewing a Confidential Memorandum, dated October 22, 1996, Woods concluded that an address book and scrap piece of paper contained mail drops addresses for affiliates of the Mexican Mafia.[2]  In addition, one of the address books contained the name of a known Mexican Mafia affiliate.

32.     During his investigation, Woods reviewed a Confidential Memorandum, dated March 29, 1993, which sets forth that Plaintiff was an associate of the Mexican Mafia.

33.     During his investigation, Woods reviewed a Confidential Memorandum, dated May 19, 1998, which sets forth that Plaintiff was a member of the Mexican Mafia.

34.     On June 8, 1998, Woods completed the investigation of Plaintiff for the purpose of his alleged gang involvement.

35.     Woods reviewed the evidence and concluded that there was sufficient evidence that Plaintiff was a member of the Mexican Mafia.

36.     Woods then prepared a prison gang validation package, along with the supporting evidence.

37.     The gang validation package for Plaintiff included three source items:  Plaintiff's address books with the scrap piece of paper, and two confidential memoranda.

38.     Woods submitted Plaintiff's gang validation package, as well as the supporting evidence, to his supervisor, Defendant Glazier, for review.  Glazier agreed with Woods that there was sufficient evidence that Plaintiff was a member of the Mexican Mafia.

39.     Plaintiff's prison gang validation package was sent to SSU/LEIU in Sacramento for review.

40.     On June 30, 1998, after having reviewed the gang validation package regarding Plaintiff, Defendant Fischer, an SSU/LEIU agent, approved Plaintiff's validation as a member of the Mexican Mafia prison gang.

///

///

---

[2]The Mexican Mafia is otherwise known as "La EME," which is the Spanish word for the letter "M."

41.     On July 6, 1998, Plaintiff was issued a Segregated Housing Order (CDC 114D) informing him that he was being retained in administrative segregation (ad-seg) because he had been validated as a prison gang member.

42.     On July 16, 1998, Plaintiff appeared in an ICC hearing, headed by Defendant Yarborough, which was held to review the continued retention of Plaintiff in ad-seg, as well as consider appropriate housing for Plaintiff given his prison gang validation.

43.     The ICC recommended Plaintiff's placement in a SHU because of his prison gang affiliation.

44.     On August 18, 1998, Plaintiff was endorsed by a classification services representative (CSR) for an indeterminate SHU term.

45.     On September 16, 1998, Plaintiff appealed his gang validation by submitting an inmate appeal (CDC 602).

46.     On December 14, 1998, Plaintiff's inmate appeal was denied at the first level.

47.     On January 28, 1998, Plaintiff's inmate appeal was denied at the second level.

48.     On June 21, 1999, Plaintiff's inmate appeal was denied at the director's level.

49.     On March 22, 1999, Plaintiff was transferred from ad-seg at CSP-Lancaster to a SHU at CSP-Corcoran.

50.     An inmate placed in a SHU will be reviewed by a classification committee at least every 180 days for consideration for release to the general population.

51.     Plaintiff received his periodic reviews by a classification committee.

53.     Plaintiff filed his complaint on April 10, 2003.

54.     Plaintiff was validated as an inactive member of the Mexican Mafia on September 28, 2004, and was subsequently released from the SHU.

1.     Plaintiff's Additional Undisputed Facts

55.     Plaintiff arrived at CSP-Lancaster on November 6, 1997.

56.     Title 15, section 3378(c)(3 of the California Code of Regulations provides that "[a] member is an inmate/parolee who has bene accepted into membership by a gang.  This identification requires at least (3) independent source items of documentation indicative of actual membership."

///

6

57.     On August 13, 1998, Plaintiff received the evidence, known as a validation package, used to validate him, which consisted of three source items.

58.     The first source item was a 1993 confidential disclosure form stating that Plaintiff had been identified as an associate of the Mexican Mafia.

59.     In 1993, CDCR, and Pelican Bay State Prison SHU, did not segregate validated SHU inmates from non-validated SHU inmates, and all inmates of the same race were housed together according to bed space and institutional needs.

60.     Prison gang activity results in the issuance of a Rules Violation Report (CDC 115).

61.     The second source item was a CDC 128-B chrono dated May 14, 1998, stating that two Mexican Mafia mail drop addresses and one Mexican Mafia associate's name were found in Plaintiff's address book.

62.     The name Alfredo Ruiz was not written in Plaintiff's address book.

63.     There is no documentation indicating that Plaintiff ever corresponded with Alfredo Ruiz.

64.     The name Domingo Luquin was not written in Plaintiff's address book.

65.     There is no documentation indicating that Plaintiff ever corresponded with Domingo Luquin.

66.     Plaintiff and Paul Portillo, an alleged Mexican Mafia associate, were at Corcoran State Prison in 1995-1996, from where Paul Portillo paroled.

67.     There is no documentation indicating that Plaintiff and Paul Portillo ever conspired, committed, or promoted prison gang activity together.

68.     The third source item was a 1998 confidential disclosure form which stated that Plaintiff had been identified as becoming a member of the Mexican Mafia.

69.     On September 16, 1998, Plaintiff was endorsed to Pelican Bay State Prison SHU to serve an indeterminate SHU term.

70.     On or around March 23, 1999, Plaintiff was transferred to Corcoran State Prison SHU pending transfer to Pelican Bay State Prison SHU

71.     The transfer never came about and Plaintiff served his entire SHU term at Corcoran.

///

///

72.     On April 15, 1999, Plaintiff appeared before the SHU Initial Classification Committee at Corcoran and informed members that he was wrongfully validated and his validation did not comport with the minimum criteria in section 3378(c)(3) of Title 15.

73.     The committee elected to retain him in the SHU and referred him to the Institutional Gang Investigator for resolution of his complaints.

74.     Plaintiff was never interviewed by the Corcoran IGI for resolution of his complaints.

75.     On August 19, 1999, CDCR changed its Gang Management Policy (08-99), which effectively gave all non-debriefing validated prisoners a mandatory minimum SHU term of six years.

76.     Six years is now the longest SHU term assessed.

77.     At the time of his validation and placement in administrative segregation, Plaintiff had been disciplinary free for six years.

78.     On January 28, 2000, Plaintiff was designated as an active member of a prison gang by a Corcoran IGI.

79.     On September 28, 2004, the three source items used to validate Plaintiff were reevaluated by

LEIU and Plaintiff was re-validated as an inactive member of a prison gang, meaning that he had not participated in any prison gang activity between July 6, 1998, and September 28, 2004.

80.     Plaintiff has at no time been accused of any specific prison gang activity.

81.     Plaintiff remained in the SHU for more than a year after he was reevaluated as an inactive member of a prison gang.

        B.     Disputed Facts

1.     Whether Woods, the IGI at CSP-Lancaster, gave adequate notice of the gang validation proceedings.

2.     Whether Woods interviewed Plaintiff before validating Plaintiff as a gang member.

3.     Whether Glazier, Woods' superior officer, permitted the validation without Plaintiff being given adequate notice and an opportunity to be heard.

4.     Whether Woods, Glazier, and Fischer, the LEUI agent, approved the validation without adequate evidence.

5.      Whether Yarborough, as Chief Deputy Warden of CSP-Lancaster, failed to provide Plaintiff with notice and a meaningful opportunity to be heard before the ICC concerning the validation and refused to provide a copy of the gang validation package.

6.      Whether Alameida and Terhune, as former Directors of CDCR, promulgated and implemented rules and regulations that went into effect on August 19, 1999, which rendered the post-validation period reviews of the classification committees meaningless because these committees did not have the power to reverse the gang validation.

        1.      <u>Plaintiff's Additional Disputed Facts</u>

7.      Whether Glazier told Plaintiff that he did not want Plaintiff in his prison and would validate Plaintiff the first chance he got.

8.      Whether IGIs and/or their designees were properly trained in identifying gang members and associates.

9.      Whether Glazier and Woods interviewed Plaintiff prior to validating him.

10.     Whether Yarborough failed to provide any documentation or specific information regarding Plaintiff's segregation, and elected to recommend SHU placement and retention in ad-seg pending SHU endorsement and transfer.

11.     Whether Woods, Glazier, and Yarborough failed to designate Plaintiff a current active gang member prior placement in ad-seg, SHU recommendation, and transfer to the SHU.

12.     Whether Plaintiff posed a real and immediate threat to others and institutional security from July 16, 1998 through October 25, 2005.

13.     Whether Plaintiff received a validation package prior to August 13, 1998.

14.     Whether the three source items used to validate Plaintiff were indicative of actual gang membership.

15.     Whether the confidential source in the CDC 130 Confidential Information Disclosure Form dated May 19, 1998, fabricated the allegation against Plaintiff to undo his own 1998 gang validation and segregation.

16.     Whether this confidential source was on psychotropic medication before, during, and after he made the allegation against Plaintiff.

17.     Whether this confidential source has since been discredited and is no longer considered reliable by IGI and LEIU.

18.     Whether after more than eight years and hundreds of debriefings, this confidential source remains the only de-briefer to ever name Plaintiff as a member of a prison gang.

19.     Whether Plaintiff's gang validation met the minimum criteria defined in section 3378(c)(3) of Title 15.

20.     Whether Plaintiff was even a member of a prison gang.

21.     Whether Plaintiff ever engaged in prison gang activity by furthering, assisting, or promoting gang activity on behalf of a prison gang.

      C.     Disputed Evidentiary Issues[3]

         1.     Plaintiff

None.

         2.     Defendants

1.     Defendants object to the introduction into evidence of "CDC Rule Change 99/08" on the grounds that it lacks authenticity and foundation, contains inadmissible hearsay, is irrelevant to Plaintiff's gang validation in June and July 1998, and the probative value of this document is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

2.     Defendants object to the introduction into evidence of "Notice of SHU Inmate Hunger Strike," dated July 2, 2001, on the basis that it lacks authenticity and foundation, contains inadmissible hearsay, is irrelevant to Plaintiff's gang validation in June and July 1998, and the probative value of this document is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

///

_____

[3] Any motions to exclude evidence must be raised in a separately filed motion in limine, addressed in section XIX(A)(2).

3.      Defendants object to the introduction into evidence of "Press Release," dated June 8, 2004, regarding the settlement of <u>Castillo v. Alameida</u>, on the basis that it lacks authenticity and foundation, contains inadmissible hearsay, is irrelevant to Plaintiff's gang validation in June/July 1998, and the probative value of this document is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

4.      Defendants object to the introduction into evidence of "Attorney-Client Communication," dated February 12, 2005, regarding the settlement of <u>Castillo v. Alameida</u>, on the basis that it lacks authenticity and foundation, contains inadmissible hearsay, is irrelevant to Plaintiff's gang validation in June and July 1998, and the probative value of this document is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

5.      Defendants object to introduction of any of Plaintiff's "Psychological (Potential Violence) Assessments" on the basis that they lack authenticity and foundation, contain inadmissible hearsay, are irrelevant to Plaintiff's gang validation in June and July 1998, and the probative value of these documents is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

6.      Defendants object to introduction of any documents regarding 'Material Conditions of Corcoran SHU" on the basis that they lack authenticity and foundation, contain inadmissible hearsay, are irrelevant to Plaintiff's gang validation in June and July 1998, and the probative value of these documents is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

7.      Defendants object to the use of title 15 of the California Code of Regulations (1999 edition), including "Emergency Amendment 99/08," to the extent that this edition is irrelevant to Plaintiff's gang validation in June and July 1998, and the probative value of this edition is substantially

///

11

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

8.      Defendants object to use of title 15 of the California Code of Regulations (2006 edition), including "Gang Management Rule Change," on the grounds that this edition is irrelevant to Plaintiff's gang validation in June and July 1998, and the probative value of this edition is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

9.      To the extent that Plaintiff attempts to introduce any documents to which Defendants have previously filed objections in their "Objections to Exhibits by Plaintiff in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment," Defendants renew those objections as though fully set forth here.

10.     Defendants will present evidence of Plaintiff's felony convictions for purposes of impeachment.  Fed. R. Evid. 609; U.S. v. Bernal-Obeso, 989 F.2d 331, 336 (9th Cir. 1993) ("As any trial lawyer knows, felony convictions trench heavily upon such a person's credibility.")

11.     Defendants object to any evidence submitted by Plaintiff, including exhibits, based upon or containing inadmissible hearsay, or that is irrelevant, immaterial, or incompetent, or lacks authentication.  Defendants specifically object to Plaintiff submitting as evidence any affidavits or declarations because they are inadmissible hearsay.  Defendants object to Plaintiff offering any opinion testimony regarding statutory or regulatory construction, prison policies and procedures, or matters that call for medical or other expertise.  Defendants reserve objection to specific testimony and specific exhibits until Defendants have had the opportunity to hear such testimony and examine such exhibits.  At the time of trial, Defendants will move to preclude all facts, contentions, and issues as to evidence not properly disclosed to Defendant during discovery.

        D.      Special Factual Information

        None.

///

///

12

IV.     Relief Sought

Plaintiff seeks compensatory and punitive damages, declaratory relief, injunctive relief, and an award of costs.

Defendants seek judgment and an award of costs.[4]

V.     Points of Law

A.     Causation Requirement

To state a claim under section 1983, a plaintiff must allege that (1) the defendant acted under color of state law and (2) the defendant deprived him of rights secured by the Constitution or federal law. Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006). Section 1983 provides:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "Section 1983 . . . creates a cause of action for violations of the federal Constitution and laws." Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997) (internal quotations omitted). "To the extent that the violation of a state law amounts to the deprivation of a state-created interest that reaches beyond that guaranteed by the federal Constitution, Section 1983 offers no redress." Id.

Section 1983 plainly requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by Plaintiff. See Monell v. Department of Social Services, 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). "A person deprives another of a constitutional right, where that person 'does an affirmative act, participates in another's affirmative acts, or omits to perform an act which [that person] is legally required to do that causes the deprivation of which complaint is made.'" Hydrick v. Hunter, No. 03-56712, 2007 WL 2445998, *5 (9th Cir. Aug. 30, 2007) (quoting Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)). "[T]he 'requisite causal connection can be established not only by some kind of direct, personal participation in the deprivation, but also be setting in motion a series of acts by

---

[4] Defendants do not anticipate seeking attorney's fees.

others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'" Id. (quoting Johnson at 743-44).

    B.  Due Process Claim Arising from Gang Validation and SHU Placement

  The Due Process Clause protects against the deprivation of liberty without due process of law. Wolff v. McDonnell, 418 U.S. 539, 556 (1974). In order to invoke the protection of the Due Process Clause, a prisoner must first establish the existence of a liberty interest for which the protection is sought. Liberty interests may arise from the Due Process Clause itself or from state law. Wilkinson v. Austin, 545 U.S. 209, 221 (2005). The Due Process Clause itself does not confer on prisoners a liberty interest in avoiding "more adverse conditions of confinement." Wilkinson, 545 U.S. at 221. Under state law, the existence of a liberty interest created by prison regulations is determined by focusing on the nature of the deprivation. Sandin v. Conner, 515 U.S. 472, 481-84 (1995). Such interests are limited to freedom from restraint which "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484.

  The assignment of validated gang members and associates to the SHU is an administrative measure rather than a disciplinary measure, and is "essentially a matter of administrative discretion." Bruce v. Ylst, 351 F.3d 1283, 1287 (9th Cir. 2003) (quoting Munoz v. Rowland, 104 F.3d 1096, 1098 (9th Cir. 1997)). As such, prisoners are entitled to the minimal procedural protections set forth in Toussaint, namely adequate notice, an opportunity to be heard, and periodic review. Bruce, 351 F.3d at 1287 (citing to Toussaint v. McCarthy, 801 F.2d 1080, 1100-01 (9th Cir. 1986)). In addition to these minimal protections, there must be "some evidence" supporting the decision. Id. (citing Superintendent v. Hill, 472 U.S. 445, 454 (1985)).

  Prisoners are entitled to "an informal nonadversary hearing within a reasonable time" after segregation, notice of the charges or reasons for segregation, and an opportunity to present their views. Toussaint, 801 F.2d at 1100. However, prisoners are *not* entitled to detailed written notice, representation, the opportunity to present witnesses, or a written decision regarding the reasons for placement. Id. at 1100-01. Further, "due process does not require disclosure of the identity of any person providing information leading to the placement . . . in . . . segregation." Id. at 1101.

///

Some evidence must support the decision reached, and "the relevant question is whether there is any evidence in the record that could support the conclusion.'" <u>Bruce</u> at 1287 (quoting <u>Superintendent</u>, 472 U.S. at 455-56). The evidence should have some indicia of reliability. <u>Cato v. Rushen</u>, 824 F.2d 703, 705 (9th Cir. 1987).

Finally, segregation "may not be used as a pretext for indefinite confinement," <u>Toussaint</u>, 801 F.2d at 1101 (quoting <u>Hewitt v. Helms</u>, 459 U.S. 460, 477 n.9 (1983)), and due process therefore requires that following validation and confinement to the SHU, prisoners be given periodic reviews of their confinement which amount to more than "meaningless gestures." <u>Toussaint</u>, 801 at 1101-02. Reviews at least every one-hundred twenty days satisfy due process. <u>Toussaint</u>, 926 F.2d at 800.

C.   <u>Punitive Damages</u>

The Plaintiff has the burden of proving what, if any, punitive damages should be awarded by a preponderance of the evidence. NINTH CIRCUIT MODEL CIVIL JURY INSTRUCTIONS § 7.5 (2007). The jury must find that the Defendants' conduct was "motivated by evil motive or intent, or . . . involves reckless or callous indifference to the federally protected rights of others." <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1986).

VI.   <u>Abandoned Issues</u>

None.

VII.   <u>Witnesses</u>

The following is a list of witnesses that the parties expect to call at trial, including rebuttal and impeachment witnesses. NO WITNESS, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE CALLED AT TRIAL UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE." Fed. R. Civ. P. 16(e); Local Rule 16-281(b)(10).

A.   <u>Plaintiff's Witnesses</u>

1.   Plaintiff Benny Tapia

B.   <u>Defendants' Witnesses</u>

1.   Defendant Woods

2.   Defendant Glazier

3.      Defendant Fischer

4.      Defendant Yarborough

5.      Defendant Terhune

6.      Defendant Alameida

7.      J. Angeles

8.      D.T. Hawkes (percipient and gang validation expert)

9.      B. Powell (classification expert)

10.     A.L. Pineda

11.     A.S. De Los Santos

12.     S. McDaniel

13.     P. McClure

14.     A. Garza

15.     Custodian of records for Plaintiff's CDCR central file

VIII.   Exhibits

        The following is a list of documents or other exhibits that the parties expect to offer at trial. NO EXHIBIT, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE ADMITTED UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE."  Fed. R. Civ. P. 16(e); Local Rule 16-281(b)(11).

        A.      Plaintiff's Exhibits

1.      Order and Hearing for Placement in Segregated Housing, CDC 114-D, dated July 6, 1998

2.      Initial Classification Committee Chronos, CDC 128G

3.      Validation package (General Chronos dated May 15, 1998, June 8, 1998, and August 13, 1998; Gang Validation/Rejection Review dated June 30, 1998; and Confidential Information Disclosure Forms dated August 13, 1998)

4.      Initial Classification Committee Review Chrono, dated April 15, 1999

5.      Notice of Change to Director's Rules, 99/08, dated August 19, 1999

6.      Gang Information Chrono, CDC 128-B, dated January 28, 2000

7.      Notice of Prisoner Hunger Strike, authored by Steve M. Castillo

8.      Gang Validation/Rejection Review, dated September 28, 2004

9.      California Prison Focus Press Release, dated June 8, 2004

10.     California Prison Focus Attorney Client Communication, dated February 12, 2005

11.     Conditions for SHU Release

12.     Departmental Review Board Hearing

13.     Psychiatric Evaluations for Board of Prison Terms/Psychosocial Assessments, dated April 1, 1993, August 22, 2001, and May 23, 2006

14.     Material Conditions of Corcoran SHU

15.     California Code of Regulations, Title 15, 1998, 1999 (including Emergency Amendment 99/08), and 2006 (including Gang Management Rule Change)

      B.      Defendants' Exhibits[5]

1.      Abstract of judgment for Plaintiff

2.      CDC 112-Chronological History of Plaintiff

3.      Excerpts from Plaintiff's deposition transcript

4.      Confidential Memorandum dated March 29, 1993 (redacted)

5.      Confidential Memorandum dated May 19, 1998 (redacted)

6.      CDC 128-B Informational Chrono dated May 14 and 15, 1998

7.      Excerpts from address books and scrap paper referenced in CDC 128-B of May 14, 1998

8.      Confidential Memorandum dated October 22, 1996 (redacted)

9.      CDC 128-B Informational Chrono dated June 8, 1998, re: gang validation investigation

10.     CDC 130 Confidential Information Disclosure Forms regarding Confidential Memorandum of 3/29/93

11.     CDC 130 Confidential Information Disclosure Forms regarding Confidential Memorandum of May 19, 1998

---

[5] Defendants also list as Exhibits 40 and 41 court orders and pleadings in this case, and other relevant documents from Plaintiff's central file records.  Defendants are required to disclose their specific exhibits and may not rely on catch-all descriptions such as these.

12.     CDC 128-B Informational Chrono dated August 13, 1998, re: receipt of gang validation documents

13.     CDC 128-B-2 Gang Validation/Rejection Review dated June 30, 1998

14.     Order and Hearing for Placement in Segregated Housing dated July 6, 1998

15.     CDC 128G regarding Initial 114D hearing before ICC, dated July 16, 1998

16.     CDC 128G regarding CSR action endorsing SHU Indeterminate, dated August 12, 1998

17.     CDC 128-B-2, dated October 17, 2003, continuing Plaintiff's validation

18.     CDC 128-B-2, dated April 2, 2004, continuing Plaintiff's validation

19.     CDC 812-A's, Notices of Critical Information-Prison Gang Identification

20.     CDC 128-B, dated January 28, 2000, re: CSP-Corcoran IGI review

21.     CDC 128-B, dated August 28, 2001, re: CSP-Corcoran IGI review

22.     CDC 128-B, dated October 12, 2001, re: CSP-Corcoran IGI review

23.     Confidential Memorandum dated February 16, 2000 (redacted)

24.     Confidential Memorandum dated May 7, 1997 (redacted)

25.     Classification Chronos re: periodic reviews

26.     CSR classification documents re: retention in SHU

27.     CDC 114-D, Annual Ad-Seg Placement Notices

28.     CDC 128-B-2, dated September 28, 2004, re: validation as inactive

29.     Central file documents regarding disciplinary actions against Plaintiff

30.     Plaintiff's CDC 602 inmate appeal regarding gang validation and SHU, and responses from various levels

31.     Department of Youth Authority Information Log and Transfer Summary

32.     August 30, 1989, Department of Youth Authority Gang Information sheet

33.     August 30, 1989, Gang Data Sheet

34.     Dewitt Nelson Training Center Report of May 1, 1990

35.     Probation Report

36.     Prisoner Evaluation Report of December 20, 2005

37.     Rule Violation Report and Incident Report documents

1    38.    Confidential Memorandum dated September 5, 1990 (redacted)

2    39.    Copies of relevant regulations, policies, and statutes, including but not limited to provisions

3           of the California Code of Regulations, Title XV

4    IX.    Discovery Documents To Be Used At Trial (Answers To Interrogatories And Responses To
            Requests For Admissions)

5           Plaintiff may offer Defendants' response to his first and second requests for admissions,

6    Defendant Yarborough's response to his first set of interrogatories, and Defendant Glazier's response

7    to his second set of interrogatories.

8           Defendants may offer portions of Plaintiff's deposition transcript.

9    X.     Further Discovery or Motions

10          A.    Discovery

11          The discovery deadline was April 21, 2005, and there are no outstanding discovery disputes

12   pending before the Court.  The parties are reminded of their continuing obligation to update all

13   discovery responses previously made if that party becomes aware of new information or becomes

14   aware that an answer in a previous response is incomplete or incorrect.  Fed. R. Civ. P. 26(e)(2).  If

15   either party intends to file motions in limine, the procedure and time requirements are set forth

16   below.

17          B.    Motion for Judgment on the Pleadings

18          Defendants assert that they are entitled to dismissal of this action in its entirety on the

19   grounds that most of Plaintiff's claims are barred by the statute of limitations, and that Plaintiff does

20   not have a protected liberty interest at stake entitling him to procedural due process protections.  Fed.

21   R. Civ. P. 12(h)(2).  The deadline for filing all pre-trial dispositive motions was June 21, 2005.[6]  This

22   action has been pending for more than four years, and the Court has expended its resources resolving

23   three pre-trial dispositive motions filed by Defendants, not one of which raised the grounds for

24   dismissal now asserted by Defendants in their pre-trial statement.

25   ///

26

27   ───────────────────

28         [6] Defendants sought and were granted an extension of time to July 5, 2005, to file their motion for summary
     judgment.

Pursuant to the Court's order of September 27, 2007, Defendants have until October 15, 2007, within which to file a motion seeking leave to modify the scheduling order and file a late dispositive motion. (Doc. 91.) The motion must address the waiver issue and must make a showing of good cause. Plaintiff has a right to oppose the motion seeking leave to modify the scheduling order. Local Rule 78-230(m). If the Court finds Defendants have met their burden to modify the scheduling order, the Court will at that time set a deadline by which to file the dispositive motion.

C.      Motion for Dismissal of Defendant Terhune

In their pretrial statement, Defendants requested that Defendant Terhune be dismissed because he is dying and unable to effectively participate in his defense. During the telephonic trial confirmation hearing held on September 27, 2007, Defendants withdrew their request for dismissal of Defendant Terhune.

D.      Motion to Withdraw as Counsel for Glazier

On September 6, 2007, Defendants' counsel filed a motion seeking to withdraw as counsel for Defendant Glazier on the ground that Defendant's refusal to communicate with counsel has made representation of Defendant impossible. The motion has been deemed submitted, and a ruling will be issued in due course. Local Rule 78-230(m).

XI.   Stipulations

Defendants offer to stipulate that the parties need not introduce evidence to prove undisputed facts 1 through 54 in section III(A).

XII.   Amendments-Dismissals

None.

XIII.   Settlement Negotiations

Plaintiff is interested in settlement negotiation, and Defendants are willing to dismiss this case for a cost waiver.

XIV.   Agreed Statements

None.

XV.   Separate Trial Of Issues

The punitive damages phase, if any, will be bifurcated.

1    Defendants request a separate trial on the issue of statute of limitations.

2    XVI.   Impartial Experts - Limitation Of Experts

3          None.

4    XVII.   Attorney's Fees

5          Plaintiff is proceeding pro se and is not entitled to attorney's fees.

6          Defendants do not anticipate seeking attorney's fees if they prevail.

7    XVIII.   Trial Exhibits

8          No special handling of trial exhibits requested.

9    XIX.   Miscellaneous

10          A.      Further Trial Preparation

11                 1.      Telephonic Trial Confirmation Hearing

12          The telephonic trial confirmation hearing was held on September 27, 2007, at 9:00 a.m.

13    before the undersigned in Courtroom 4.

14                 2.      Motions In Limine Hearing and Briefing Schedule

15          Any party may file a motion in limine.  The purpose of a motion in limine is to establish in

16    advance of the trial that certain evidence should not be offered at trial.  Although the Federal Rules

17    do not explicitly provide for the filing of motions in limine, the Court has the inherent power to hear

18    and decide such motions as a function of its duty to expeditiously manage trials by eliminating

19    evidence that is clearly inadmissible for any purpose.  Luce v. United States, 469 U.S. 38, 41 n. 4

20    (1984); Jonasson v. Lutheran Child and Family Services, 115 F. 3d 436, 440 (7th Cir. 1997).  The

21    Court will grant a motion in limine, and thereby bar use of the evidence in question, only if the

22    moving party establishes that the evidence clearly is not admissible for any valid purpose.  Id.;

23    Hawthorne Partners v. AT & T Technologies, Inc., 831 F. Supp. 1398, 1400 (N.D. Ill. 1993).

24          All motions in limine must be served on the other party, and filed with the Court, by **January**

25    **29, 2008**.  Any motion in limine must clearly identify the nature of the evidence that the moving

26    party seeks to prohibit the other side from offering at trial.

27          Any opposition to a motion in limine must be served on the other party, and filed with the

28    Court, by **February 19, 2008**.

1    If any party files a motion in limine, the Court will hear and decide such motions on the

2 morning of trial.

3    Whether or not a party files a motion in limine, that party may still object to the introduction

4 of evidence during the trial.

5        3.   Other

6    The parties are relieved of their obligation under Local Rule 16-285 to file trial briefs.

7    The Court will prepare the verdict form, which the parties will have the opportunity to review

8 on the morning of trial.  If the parties wish to submit a proposed verdict form, they must do so on

9 or before **February 19, 2008**.

10    Defendants shall file proposed jury instructions as provided in Local Rule 51-163 on or

11 before **February 19, 2008**.  If Plaintiff wishes to file proposed jury instructions, he must do so on

12 or before **February 19, 2008**.

13    In selecting proposed instructions, the parties shall use Ninth Circuit Model Civil Jury

14 Instructions to the extent possible.  All jury instructions must be submitted in duplicate: One set will

15 indicate which party proposes the instruction, with each instruction numbered or lettered, and

16 containing citation of supporting authority, and the customary legend, i.e., "Given, Given as

17 Modified, or Refused," showing the Court's action, with regard to each instruction.  One set will be

18 an exact duplicate of the first, except it will not contain any identification of the party offering the

19 instruction or supporting authority or the customary legend of the Court's disposition.  Defendants

20 shall provide the Court with a copy of their proposed jury instructions via e-mail at:

21 ljoorders@caed.uscourts.gov.

22    Proposed voir dire questions, if any, shall be filed on or before **February 19, 2008**.  Local

23 Rule 47-162.

24    The parties may serve and file a non-argumentative, brief statement of the case which is

25 suitable for reading to the jury at the outset of jury selection on or before **February 19, 2008**.  The

26 Court will consider the parties' statements but will draft its own statement.  The parties will be

27 provided with the opportunity to review the Court's prepared statement on the morning of trial.

28 ///

The original and two copies of all trial exhibits along with exhibit lists shall be submitted to Courtroom Deputy Irma Lira no later than **February 19, 2008**.  All of Plaintiff's exhibits shall be pre-marked with the prefix "PX" and numbered sequentially beginning with 100 (e.g., PX-100, PX-101, etc.).  All of Defendants' exhibits shall be pre-marked with the prefix "DX" and numbered sequentially beginning with 200 (e.g., DX-200, DX 201, etc.).

XX.   Objections to Pretrial Order

Any party may file and serve written objections to any of the provisions of this Order on or before **November 5, 2007**.  Such objections shall specify the requested modifications, corrections, additions, or deletions.

***

<u>FAILURE TO COMPLY WITH ALL PROVISIONS OF THIS ORDER MAY BE GROUNDS FOR THE IMPOSITION OF SANCTIONS, INCLUDING POSSIBLE DISMISSAL OF THIS ACTION OR ENTRY OF DEFAULT, ON ANY AND ALL COUNSEL AS WELL AS ON ANY PARTY WHO CAUSES NON-COMPLIANCE WITH THIS ORDER.</u>

IT IS SO ORDERED.

**Dated:    October 7, 2007            /s/ Lawrence J. O'Neill**
                                        UNITED STATES DISTRICT JUDGE